Filed 2/1/23  P. v. Flores CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOAQUIN FLORES et al.<br><br>Defendants and Appellants. | B322682<br><br>(Merced County<br>Super. Ct. Nos. 18 CR-03528C,<br>18 CR-03528D) |

APPEAL from judgments of the Superior Court of Merced County, Jeanne Schechter, Judge.  Convictions affirmed; gang enhancement findings vacated and matter remanded for further proceedings.

Spolin Law and Aaron Spolin for Defendant and Appellant Joaquin Flores.

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant Eric Cruz Madero.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, Jennifer Oleska, Robert K. Gezi and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Joaquin Flores and Eric Cruz Madero were convicted of attempted murder (Pen. Code,[1] § 187/664) and assault with a deadly weapon (§ 245, subd. (a)(1)), with gang enhancements under section 186.22 found true. On appeal, they argue (1) the judgments must be vacated and the matter remanded for retrial in light of new provisions of law permitting the bifurcation of trials involving gang evidence; and (2) the gang enhancements must be vacated due to changes in section 186.22. Individually, Madero argues the court erred when it denied his motion for a mistrial. Flores contends (1) his conviction for attempted murder must be reversed because he may have been convicted on a theory of natural and probable consequences; (2) the court erred in denying his motion for a continuance without a hearing; (3) the court erred when it did not dismiss the indictment pursuant to section 995; and (4) cumulative error requires reversal. We vacate the gang enhancements and remand them for further proceedings; in all other respects, we affirm the judgments.

### FACTUAL AND PROCEDURAL BACKGROUND

On June 1, 2018, Sureño gang member Madero stabbed fellow Sureño Luis Prado inside a dedicated Sureño cell block of the Merced County jail. Surveillance cameras in the cell block captured the events leading up to the stabbing and the incident itself.

Santiago Martinez was the most influential Sureño member on the cell block; however, he was not the leader of the block because he was housed there temporarily only for a court proceeding. Juan Gonzalez was the leader of the cell block and

---

[1]    Undesignated statutory references are to the Penal Code.

2

was referred to as the "key holder," or the person "running the politics" on the cellblock. Appellant Flores was the highest status gang member in one of the cells, Cell 4-1, and was the leader of that cell. Flores had enough standing within the Sureños that he had control over decisions involving firearms for the gang and influence over younger members. Appellant Madero was an active member of the gang but had no status.

Victim Prado was not in good standing with the gang as of the time of the attack. He was housed in Cell 4-1, which consisted of two bunk areas (4-1A and 4-1B) connected by a dayroom. Flores, Madero, and Fabian Rodriguez were among the other inmates housed in this cell.

In the minutes before the stabbing, Madero was seen speaking with Angel Guzman, an inmate in the adjacent cell. Guzman spoke with cell block leader Gonzalez, then wrote a "kite," or note, on a piece of paper. Guzman showed the kite to Gonzalez before handing it to Madero. As Gonzalez was the key holder of the cellblock, a gang expert witness opined that this set of events was the process of consulting with upper-echelon members of the gang to obtain permission to carry out the attack.

Appellant Madero took the kite and resumed his conversation with appellant Flores. In the adjacent cell, Guzman spoke with Martinez and then went behind the shower curtain to the shower area with another inmate, Omar Jimenez. Jimenez and Guzman's feet were perpendicular to the toilet and facing each other, indicating they were engaged in conversation or passing contraband rather than using the facilities.

Prado washed a food bowl in the shower area of the cell and then sat down to eat. Rodriguez, spoke briefly with appellants, then left that bunk area and went to the other bunk area, where

3

Prado was eating. The gang expert opined Rodriguez was letting Madero and Flores know that Prado was in a vulnerable position. He was then standing near Prado to be able to communicate when Prado was in a position of disadvantage.

Appellant Madero approached the wall between two cells and retrieved a white washcloth-type rag from Guzman, who had used a mirror to ensure he was handing the item to the proper recipient. Based on the lay of the fabric, it appeared a rigid object was concealed within the washcloth. Madero took the item to the bunk and resumed his conversation with Flores. Flores moved to sit with Madero in a spot where a hanging uniform blocked them from view.

Soon after Madero retrieved the package in the white washcloth, Guzman retrieved a similarly wrapped item in a black cloth and handed it over to Flores. Flores gave that item to Madero. The gang expert opined Flores was coaching Madero.

Victim Prado entered the shower area of the cell. Rodriguez glanced over his shoulder at Prado; in the shower, Prado had his back to the dayroom and was in a position of disadvantage. Rodriguez then walked into the bunk area where Flores and Madero were sitting, picked up a chair, and set it down in the dayroom, but he did not sit down on it. The gang expert understood this otherwise purposeless action was an excuse to enter the bunk area where Flores and Madero were.

As soon as Rodriguez moved the chair, Madero and Flores stood up. Flores walked up to the wall dividing the cell from the next cell and handed the white washcloth back to Guzman. Martinez put it in a trash can outside the cell. The gang expert opined they did this to throw evidence several cells away from the incident.

Madero headed toward the dayroom where Prado was, and as soon as Madero entered the dayroom, Rodriguez left the room.

Madero moved to the shower area where Prado was and began to stab him.  The first strike was overhand and aimed at Prado's neck and head area; he continued stabbing Prado for more than 30 seconds.  Flores came to the doorway where he could see the attack.  Several uninvolved inmates rushed to get out of the area when the attack began, but Flores remained in the doorway of the dayroom, arching his neck and turning his head to watch what was happening.

The gang expert opined that Flores, the cell block leader, was watching to make sure Madero carried out his assigned task.  The Mexican Mafia were frustrated that hits they ordered were not being properly carried out, and "so it became the process that people within the cell had to vet what actually happened and send a report back stating, yes, we actually carried it out.  I personally saw what happened.  This is what happened.  This is the way it happened.  And these are the results of what happened."  The person carrying out the orders would understand from being watched by a high-ranking gang member that if he did not complete the task, a report would be sent up the chain of command that he did not properly carry out orders he was given.  Not following orders leads to negative consequences.

Madero continued to stab Prado, who was bleeding profusely.  Blood was spattering.  The surveillance video showed Flores looking down at his shirt and then changing his clothes.  Flores went to the wall between the cells and appeared to be communicating with the adjacent cell while looking back toward the attack several times.  Flores pointed at blood on the floor, at

which point other inmates began to clean up the blood with a spray bottle and towel.

As the struggle continued, Madero and Prado were losing energy. Madero went to the bunk room, retrieved the second shank, and resumed stabbing Prado, striking with both hands.

Correctional officers who had heard an ominous laugh and a person saying, "help," investigated and discovered the altercation. Madero was using both hands and at least one weapon to strike Prado, who was crouching and trying to protect himself with his hands. Madero continued to stab Prado rapidly and with determination even after the officers arrived; officers tased him twice to get him to stop. Prado, seeing Madero on the ground, picked up a shank and stabbed Madero a few times.

The attack lasted about five minutes. For the entire duration of the attack and the subsequent investigation, an inmate in Gonzalez's cell, Manuel Vera, stood at the bars with a mirror pointed toward the cell where the attack took place. The only time Vera stopped watching was when Gonzalez took the mirror and looked for himself before returning the mirror to Vera. It is common practice for higher-level gang members to order lower-level gang members to gather intelligence.

Prado sustained numerous stab wounds to his head, neck, shoulders, arms, chest, and side and was taken to a trauma hospital.

The Mexican Mafia controlled the Sureño gang. A special agent from the Department of Corrections and Rehabilitation testified that every local jail was controlled by a Mexican Mafia member. The gang member in charge of the jail reported to his higher-up in the Mexican Mafia. If the highest ranking gang member within the jail wanted to assault someone in the jail, he

had to consult the Mexican Mafia member to seek approval. Sometimes approval would be given immediately; other times, the Mexican Mafia member would want to "do some research," meaning to determine whether the potential victim could be assaulted. The ultimate response could be yes, no, or "try to educate them" that whatever they had done was "not what we're trying to do." Before a murder would be attempted or committed, the plan would be vetted inside the Sureño organization.

Flores, Madero, and many of the other inmates allegedly involved in the coordinated attack were indicted. A jury convicted both Flores and Madero of attempted murder. The jury separately found each defendant had committed the attempted murder "willfully, deliberately, and with premeditation, in violation of Penal Code section 189." For each defendant, as to the attempted murder, the jury found true a gang enhancement allegation pursuant to section 186.22, subdivision (b)(1)(c).)

The jury also found Flores and Madero guilty of assault with a deadly weapon and found true a gang enhancement allegation (§ 186.22, subd. (b)(1)(a)). Additionally, the jury found Madero had inflicted great bodily harm in the commission of both the attempted murder and the assault with a deadly weapon (§ 12022.7).

On the attempted murder, Flores was sentenced to life in prison with the possibility of parole, plus a consecutive 10-year sentence for the gang enhancement; his 8-year sentence for the assault and its associated enhancements was stayed pursuant to section 654. Madero was sentenced to 18 years to life in prison for the attempted murder and great bodily injury enhancement, plus a stayed sentence of 17 years on the assault with a deadly weapon count and enhancements. Both appeal.

## DISCUSSION

I.   *Both Appellants: Impact of Section 1109*

Appellants argue that recently-added section 1109, which requires that a gang allegation be tried separately at the request of a defendant and only after the defendant is found guilty of the substantive offense (Stats. 2021, ch. 699, § 5), must be applied retroactively.  They contend the introduction of gang evidence during trial amounted to structural error warranting a reversal on all counts.  Alternatively, they argue reversal is warranted even if harmless error analysis applies, because the prejudicial evidence contributed to the verdicts.

The question whether section 1109 applies retroactively is the subject of split authority among the Courts of Appeal.  (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–568, review granted Jul. 13, 2022, S274743 [section 1109 is retroactive]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129–1131 [retroactive]; with *People v. Perez* (2022) 78 Cal.App.5th 192, 206–207, review granted Aug. 17, 2022, S275090 [not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64–65, review granted Aug. 17, 2022, S275341 [not retroactive].)  The California Supreme Court granted review in many of these cases pending the resolution of a related issue in *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*).  However, the Supreme Court ultimately "decline[d] to resolve this split" in the *Tran* opinion because any asserted error in failing to bifurcate was harmless as to Tran's guilty verdicts and penalty judgment.  (*Id.* at p. 1208.)

The *Tran* court did reject the contention that failure to bifurcate constitutes structural error and concluded that the *People v. Watson* (1956) 46 Cal.2d 818, standard for state law error applies when examining whether the failure to bifurcate

8

was prejudicial with respect to an appellant's guilty verdicts. (*Tran, supra,* 13 Cal.5th at pp. 1208–1209.) We follow the *Tran* court's lead and examine whether the failure to bifurcate was prejudicial under *Watson.* Although appellants acknowledge that some of the evidence might have been admissible in a bifurcated trial to show motive and personal relationships, they contend that "it is inconceivable" that the amount and type of gang evidence offered at trial would have been presented if the trial had been bifurcated. They argue "there was a great deal of prejudicial gang evidence which would have been inadmissible at a bifurcated trial on the charged offenses," such as evidence of the 10 predicate offenses offered by the prosecutors; expert testimony that murder was a primary activity of the gang; evidence that murders and attempted murders helped Sureño and Mexican Mafia members gain status and power within the gangs; and evidence that committing murders in and out of custody benefitted gang members by showing "dominance via fear."

While not all the evidence pertaining to gangs would have been admissible in a bifurcated trial, the majority of it would have been admissible because of its relevance to the substantive charges. "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040,

1049.)  Even if count 5[2] and the gang enhancement allegations had been tried separately, gang evidence would have remained at the center of this case because it involved a violent crime committed by one gang member against another in a cell block where all the prisoners were members of that same gang. Evidence of the participants' respective status within the gang, the culture of the gang, the means of advancement within the gang, the value to the gang and its members of instilling fear, and the status and power members obtain by committing murders and attempted murders would have remained relevant to provide context and to establish issues such as motive and intent.  The cooperative conduct, consultations, and behavior of the various inmates seen on the surveillance footage could not be explained without understanding the internal politics, leadership structure, chains of command, incentives, communication practices, discipline, rules, and operation of the gang.  Given the overwhelming level of gang and gang violence evidence necessarily presented in the context of this case, as well as the strength of the evidence against appellants in this video-recorded attack, we find no reasonable probability they would have obtained a more favorable result if their trials had been bifurcated.  Therefore, even if section 1109 is considered to operate retroactively, it does not warrant reversal here.

---

[2]      Both defendants were also charged in count 5 with active participation in a criminal street gang (§ 186.22, subd. (a)); this charge was dismissed at the prosecutor's request at the close of evidence.

10

## II.    *Both Appellants: Gang Enhancement Findings*

The People and appellants agree, as do we, that the gang enhancement findings must be reversed due to postconviction legislative changes to section 186.22.

"In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022.  Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.'  (§ 186.22, subd. (f), italics added.)  Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang.  (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)"  (*Tran, supra,* 13 Cal.5th at p. 1206.)  These ameliorative changes apply

11

retroactively to defendants whose convictions are not yet final. (*Id*. at pp. 1206–1207.)

"When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra*, 13 Cal.5th at p. 1207.) Here, as the Attorney General concedes, reversal is necessary because Madero and Flores's convictions are not final; one of the predicate offenses presented at trial is no longer eligible for use to establish a pattern of criminal gang activity; and evidence presented at trial failed to establish that the predicate offenses commonly benefited a criminal street gang, and the common benefit was more than reputational, as now required by section 186.22.

Accordingly, all gang findings and enhancements must be reversed. On remand, the prosecution shall have the opportunity to retry the gang allegations under the amended requirements of section 186.22. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 [when a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand].)

III. ***Madero: Denial of Mistrial Motion***

Before trial, Madero filed a motion in limine to exclude a statement made by Detective Matthew Vierra about investigating a homicide in which Madero was a suspect. At the hearing on the motion in limine, the prosecutor agreed not to "admit evidence or testimony regarding the pending—the arrest on the homicide for

Mr. Madero." The court noted that counsel had reached an agreement but that it would have granted the motion in limine with respect to mentioning the homicide.

During trial, on cross-examination by Madero's counsel, Officer Jason DaSilva described his past contacts with Madero and testified that the large "A" tattoo on Madero's face had not been there in the past. He said, "That tattoo is new. I haven't—I haven't seen it until now." Madero's counsel asked DaSilva when his last contact with Madero was, and DaSilva responded, "I can't recall an exact day. It was before he got arrested for homicide."

Madero's counsel said, "Okay. Nothing further. I'd make a motion to strike the last portion of his testimony, [Y]our Honor."

The court struck the testimony and said, "Ladies and gentlemen, what that means is you're not to consider that last portion of the officer's testimony for any reason. Just disregard that."

Outside the presence of the jury, Madero's counsel moved for a mistrial "based on DaSilva's gratuitous testimony yesterday saying that he had arrested my client for a homicide." She argued that because the current case was an attempted murder case, hearing Madero had been "arrested for murder" created prejudice that she thought could not be dispelled by an admonition. Madero's counsel acknowledged that case law consistently found curative admonitions to be sufficient to address the improper testimony under most circumstances, but expressed that she personally felt differently. She argued, "But personally it seems to me that it's like, you know, an infection spread and that it's very hard for an admonition to un-ring the bell, especially when we're talking about issues of attempt[ed] murder and the mental state of attempt[ed] murder to hear

13

that. . . my client had been arrested for murder, even though it's not a conviction, just the very specter that there is an arrest would, I believe, be toxic" to the jury.

The court observed that DaSilva did not actually say "murder," he said "homicide," which is more vague. The court suspected the jurors knew there are various forms of homicide and that not every homicide is a murder. The court contrasted this "very serious case," in which evidence of other serious crimes had been admitted and reference had been made to other individuals who had been convicted of murder, with the statement DaSilva made, which, while improper, was "just reference to an arrest."

The court noted the jury already knew Madero was in custody for something—this had been disclosed during voir dire—and the jurors had all been asked "whether or not . . . they would consider somebody guilty just because they were arrested for something. They understand the presumption of innocence. They've all agreed they're not going to hold those types of things against anyone."

The court also discussed its observations of the impact of the testimony on the jury. "Everybody did remain calm" when the improper testimony was given. The jury had been very attentive and had not engaged in emotional displays despite seeing footage depicting a very violent attack, some injuries, and a lot of blood—"[T]hey've all been just pretty even tempered about everything." The court concluded, "I haven't seen any emotions, so I really don't find that this rises to the level where the trial has been so [affected] and . . . your client's situation has been irreparably harmed." Noting that it would again instruct

14

the jury in closing instructions that jurors could only consider the evidence presented to them, the court denied the motion.

Madero asserts the court erred in denying his motion for a mistrial. He argues that because the jury knew he was a Sureño; that murder was a primary activity of the Sureños; and that Madero was in jail at the time of the incident, the jury, upon hearing that he had been arrested for homicide, "must have immediately drawn the logical conclusion that—when appellant attacked Prado on June 1, 2018—appellant was in jail for having recently murdered another person." He characterizes the prejudice as extreme, obvious, and incurable because a major contested issue at trial was whether Madero committed attempted murder or assault with a deadly weapon.

"In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.] 'We review a ruling on a mistrial motion for an abuse of discretion. [Citations.] A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " [Citation.] "In making this assessment of incurable prejudice, a trial court has considerable discretion." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 121.)

Whether a particular incident is so prejudicial that it warrants a mistrial "requires a nuanced, fact-based analysis," which is best performed by the trial court. (*People v. Chatman* (2006) 38 Cal.4th 344, 370.) Here, the court identified a number of observations supporting its conclusion that its admonitions were sufficient to cure any prejudice. The officer's mention of a homicide arrest, while entirely improper, was not a declaration that Madero had been arrested for murder, as Madero claimed.

15

The mention was brief, and it was immediately followed by a motion to strike, a ruling striking the testimony, and a timely admonition to the jury. The jury had not reacted in a way that suggested the reference had impacted them at all, let alone incurably prejudiced them. The jurors had known Madero was in custody from the beginning—the incident took place in a jail—and they had already expressly agreed in their responses to a screening questionnaire that the fact that the defendants were in custody at the time of the charged crimes would not affect their ability to be fair. Additionally, the court intended to, and subsequently did, instruct the jury in closing instructions to disregard any testimony that had been stricken. Under these circumstances, the court could reasonably conclude any potential for prejudice was cured by the admonition, Madero's chances of receiving a fair trial had not been irreparably damaged, and a mistrial should not be granted. The court did not abuse its discretion.

## IV.  *Flores: Natural and Probable Consequences*

Flores argues his conviction for attempted murder should be reversed because the jury was instructed it could convict him on multiple theories, one of which was a natural and probable consequences theory. A defendant may no longer be convicted of attempted murder under the natural and probable consequences doctrine in light of the passage of Senate Bill Nos. 1437 and 775. (Pen. Code, § 188, subd. (a)(3); see *People v. Sanchez* (2022) 75 Cal.App.5th 191, 197.) The instruction Flores refers to is CALCRIM No. 417.

CALCRIM No. 417 provides in relevant part, "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.

"A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. [Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.]

"A *natural and probable* consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

"To prove that the defendant is guilty of the crime[s] charged in Count[s] _____, the People must prove that:

"1. The defendant conspired to commit one of the following crimes: _____*<insert target crime[s]>*;

"2. A member of the conspiracy committed _____*<insert nontarget offense[s]>* to further the conspiracy;

"AND

"3. _____*<insert nontarget offense[s]>* (was/were) [a] natural and probable consequence[s] of the common plan or design of the crime that the defendant conspired to commit."

CALCRIM No. 417 was barely mentioned when the court and counsel conferred on jury instructions. The court, which had sent a set of proposed instructions to the parties, said, "417, liability for co-conspirator's acts. That's pretty standard. Just list it as attempted murder, assault with a deadly weapon." None of the attorneys commented or objected.

The court read CALCRIM No. 417 to the jury here. The court said, "To prove a defendant is guilty of the crimes charged in Counts One and Two, the People must prove that, one, the defendant conspired to submit [*sic*] one or both of the following crimes, attempted murder and assault with a deadly weapon. Two, a member of the conspiracy committed an act to further the conspiracy; and, three, you know what? I'm sorry, ladies and gentlemen. I—there seems to be something omitted on my instruction here. Give me just one second. I apologize." The court had just realized the instruction was inapplicable: CALCRIM No. 417 concerns situations in which a nontarget offense was committed, but here, there were no nontarget offenses.

After a pause, the court continued, "All right. And the attempted murder and assault with a deadly weapon were natural and probable consequences of the common plan or design of the crime that the defendants conspired to commit." The court continued instructing the jury.

At the next break in the proceedings, the court told the parties it had given CALCRIM No. 417 but as it was reading the instruction, it "hit that roadblock in [CALCRIM No.] 417, liability for co-conspiracy, [because] I think that instruction[] deals with if there [w]as [a] non-target offense that ends up being committed. I don't really think that instruction should have been given.

18

They've already heard it. I could leave it in, but it's not really an applicable instruction." The prosecutor and both defense attorneys consented to the instruction being removed, and the court withdrew the instruction. Flores did not request the court re-instruct the jury or otherwise address the mistaken instruction with the jury.

The trial court was correct that this instruction was inapplicable. CALCRIM No. 417 only applies when there is a conspiracy to commit a target offense and additional non-target offenses are committed along the way. (See *People v. Gentile* (2020) 10 Cal.5th 830, 838 ["When an accomplice aids and abets a crime, the accomplice is culpable for both that crime and any *other offense committed that is the natural and probable consequence of the aided and abetted crime*. Natural and probable consequences liability can be imposed even if the accomplice did not intend the *additional offense*"], italics added.)

" 'Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally " 'only a technical error which does not constitute ground for reversal.' " ' [Citation.] Such error does not implicate the defendant's constitutional rights and is subject to harmless error review under *People v. Watson*, *supra*, 46 Cal.2d at page 837." (*People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1247 (*Falaniko*), disapproved on another ground in *People v. Canizales* (2019) 7 Cal.5th 591, 607–608, fn. 5.)

We conclude the error in reading CALCRIM No. 417 was harmless. Flores asserts reversal is required because the verdict does not show whether the jury convicted him on an aiding and abetting theory or based on the natural and probable

19

consequences doctrine, but he has not identified, nor can we, any way the jury could have convicted him of attempted murder on a true natural and probable consequences theory. In closing argument, the prosecutor argued Flores could be convicted in one of two ways: either as an aider and abetter or as a member of a conspiracy to attempt to kill Prado. The prosecutor did not rely on, and in fact never mentioned, natural and probable consequences in closing arguments. There was no evidence or argument in this case suggesting Flores lacked the intent to kill Prado but was convicted of attempted murder as a natural and probable consequence of some other actually-intended offense. And the jury expressly found that Flores committed the attempted murder willfully, deliberately, and with premeditation, meaning that he intended to kill Prado.

Even if the jury had tried to apply CALCRIM No. 417—which did not appear in the packet of instructions provided to them—the instruction would have led to a tautology: the jury would have been deciding whether the target offenses were the natural and probable consequences of the target offenses. Given the jury's determination that Flores intended to kill, convicting Flores of attempted murder for participating in a conspiracy to try to kill Prado could not have involved impermissibly imputing malice to him or imposing vicarious liability for an offense other than the crime he intended. (See *People v. Johnson* (2020) 57 Cal.App.5th 257, 267 [culpability under the natural and probable consequences doctrine is not premised upon the defendant's intention to commit the nontarget offense because the nontarget offense was not intended; doctrine imposes vicarious liability for any offense committed by the direct

20

perpetrator that is a natural and probable consequence of the target offense].)

We are not convinced the error in reading CALCRIM No. 417 to the jury allowed it to convict appellant under a natural and probable consequences theory or any incorrect legal theory. We conclude the " 'instruction on the [natural-and-probable-consequence] rule must have been understood, and dismissed, by the jury as mere surplusage. [Citation.] It cannot be held to have resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13.) It was too insignificant to have affected the outcome within a "reasonable probabilit[y]" ' " (*Falaniko*, *supra*, 1 Cal.App.5th at p. 1248.) As Flores was convicted of the attempted murder either for aiding and abetting Madero or as part of a conspiracy to attempt to kill Prado, and *not* as a natural and probable consequence of some crime other than the one he intended, Flores is not entitled to reversal of his attempted murder conviction.

V.      ***Flores: Denial of Requested Continuance***

On June 3, 2019, the day before trial, Flores's counsel orally moved for a continuance. Counsel said, "As the Court's aware, I had filed a motion requesting additional funds for a gang expert. It was initially denied. I filed a supplemental declaration addressing that, Your Honor. At this time, I would be requesting additional time. I think that given the gang components of this case, I think that a[n] expert is very appropriate to provide an adequate defense for Mr. Flores and I'd ask at this time to continue so that I can secure that expert."

The court reminded Flores's counsel it had granted her initial request for funds for a gang expert the previous year, and in doing so she had "vouched for the abilities of that particular expert and the credentials and very extensive [curriculum vitae]

21

was submitted."  Her request the prior fall "clearly showed that that expert had experience that would be pertinent to this case now, and money was expended, a substantial amount of money was expended with respect to that expert.  And then now at the 11th hour, now you're requesting even more funds, a lot more funds, for a different expert."

"Yes," said Flores's counsel.

The court told counsel her request was "certainly untimely.  This is something that should have been done months ago, especially before funding was expended."  The court continued, "[Y]ou vouched for the initial expert and so the Court is going to deny your motion.  If you choose to use that expert, that's up to you."  The court confirmed trial would begin the next day.

Section 1050, subdivision (b), requires that continuances be requested by written notice served and filed at least two court days before the hearing sought to be continued.  If that requirement is not followed, "the court shall hold a hearing on whether there is good cause for the failure to comply with those requirements."  (§ 1050, subd. (d).)  If the moving party is unable to show good cause for the failure to give notice, the motion for continuance shall not be granted.  (*Ibid*.)  If the moving party shows good cause for failing to request a continuance using the procedure in section 1050, subdivision (a), then the court considers whether the party has demonstrated good cause for the requested continuance.  (§ 1050, subds. (e) & (f).)

Flores contends his convictions must be reversed because the trial court did not hold a hearing before denying the request for a continuance.  He cites no authority for the principle that a defendant is entitled to a reversal if no hearing is held on whether counsel had good cause for failing to file a proper written

continuance motion.  Nor are we aware of any such authority. Even when a court abuses its discretion in denying a requested continuance, reversal of a conviction is not required unless there is a showing of prejudice to the defendant.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 840 ["In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of his or her motion for a continuance does not require reversal of a conviction"].)  We cannot conceive any reason that a court's abuse of discretion in failing to hold a hearing on whether the moving party had good cause for failing to give proper notice would require reversal without a showing of prejudice when an abuse of discretion in denying the continuance itself is reversible error only if the defendant can demonstrate prejudice.  Here, Flores has not demonstrated any way he was prejudiced by the court's choice to proceed directly to the merits of the continuance request rather than concern itself with why he did not follow the procedural requirements of section 1050, subdivision (b).

Flores also claims the court did not decide whether good cause existed for a continuance.  Although the court did not make express findings, its comments amount to a conclusion that there was no good cause to continue the trial.  "A continuance in a criminal case may be granted only for good cause.  (§ 1050, subd. (e).)  Whether good cause exists is a question for the trial court's discretion.  [Citation.]  The court must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " '  [Citation.]  While a showing of good cause requires that both counsel and the defendant demonstrate they

23

have prepared for trial with due diligence [citation], the trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

Here, there was no abuse of discretion. Flores's request for a continuance hinged on the approval of funds for a new expert witness—counsel asked for additional time to "secure th[e] expert" that would be hired with the additional funds she was seeking. The court decided not to change its prior ruling and not to approve supplemental funds for another expert—because the request was untimely and Flores had been given funds for a gang expert months before. This ruling meant there was no need to continue the trial.

Flores has not established otherwise: in his opening brief he did not demonstrate the court's ruling on the request for additional funds was erroneous or he had good cause for the requested continuance. He asserted for the first time in his reply brief that he had no opportunity to present evidence of good cause because the court did not hold a hearing, but section 1050 does not require any particular formalities for a hearing on a motion to continue trial. Flores' counsel had the opportunity to state why she believed a continuance was necessary, and she did. The court, which had previously denied Flores's request to hire another gang expert, reiterated that the request for an additional expert was untimely and unjustified; that determination eliminated the stated necessity to continue trial.

Flores also argues in his reply brief that denying his requested continuance to obtain a new gang expert was prejudicial because the case centered on the gang expert's subjective and speculative interpretation of silent security video.

24

This argument ignores the fact that Flores had been granted funds to hire a gang expert the prior year. He does not explain why not being allowed to delay the trial to obtain a second expert on the same subject was or could be prejudicial to him. The court did not abuse its discretion in refusing to grant a continuance.

## VI.  *Flores: Denial of Motion to Dismiss Indictment*

Before trial, Flores unsuccessfully moved to set aside the indictment on the ground that insufficient evidence had been presented to the grand jury to convict him. Flores contends on appeal that the trial court erred when it refused to dismiss the indictment pursuant to section 995.

In his opening brief, Flores discussed at length what he claims to be the insufficiency of the evidence presented to the grand jury. He did not assert he was prejudiced at trial in any way by the denial of his motion to dismiss the indictment. "[E]ven an erroneous denial of a section 995 motion justifies reversal of a judgment of conviction only when a defendant is able to demonstrate prejudice at trial flowing from the purportedly inadequate evidentiary showing at the preliminary hearing." (*People v. Crittenden* (1994) 9 Cal.4th 83, 136–137, impliedly overruled on another ground by *People v. Yeoman* (2003) 31 Cal.4th 93.)

Belatedly, in his reply brief, Flores asserts he was prejudiced by the denial of his motion to dismiss the indictment because the same deputy who testified before the grand jury also testified at trial. Arguing the "same evidence" used to indict him was used to convict him, he claims that deputy's "testimony was insufficient to support an indictment, and it was insufficient to support the convictions. Therefore, Appellant was prejudiced by the trial court's failure to set aside the indictment."

25

This conclusory assertion in the reply brief is inadequate to challenge the sufficiency of the evidence to support the convictions. "[W]hen a criminal defendant claims insufficiency of the evidence on a particular element of the crime of which he was convicted, we presume the evidence of that element was sufficient, and the defendant bears the burden of convincing us otherwise. To do so, the defendant must present his case to us in a manner consistent with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief all of the material evidence on the disputed element in the light most favorable to the prosecution, and then must persuade us that that evidence cannot reasonably support the jury's verdict." (*People v. Battle* (2011) 198 Cal.App.4th 50, 62.) Flores did not allege any prejudice or insufficiency of the evidence at trial in his opening brief, and even in his reply brief he did not discuss or cite to any trial evidence or make any argument to support his contention that the evidence at trial was insufficient to support the convictions and enhancement allegation findings. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Alternatively, Flores argues "there is a good faith basis to modify the Supreme Court's holding" in *Crittenden*. Flores misunderstands our authority. We are bound by the rulings of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

26

VII. ***Flores: Cumulative Error***

In a conclusory argument in his reply brief, Flores alleges that the cumulative effect of the errors he asserts irreparably prejudiced his right to a fair trial. This argument is forfeited because Flores did not raise it in his opening brief. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93.)

Even if we were to consider this argument, Flores's claim presents no basis for reversal. The gang enhancements must be vacated and the matter remanded so that Flores may obtain the benefit of a subsequent ameliorative change in the substantive law. Even assuming section 1109 is retroactive, the failure to bifurcate was harmless, and there was no conceivable prejudice from the court's reading of one inapplicable jury instruction that could not have been applied to Flores's detriment.

## DISPOSITION

The gang enhancement allegation findings under section 186.22 are vacated, and the gang enhancements are remanded to the trial court for retrial, should the People so decide. In all other respects, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.                              WILEY, J.

27